# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0269-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CREIGHTON P. WILLIAMS,

     Defendant-Appellant.

_____

Submitted February 27, 2019 – Decided June 12, 2019

Before Judges Alvarez and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 13-07-1274.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Creighton P. Williams was convicted of the lesser-included offense of petty disorderly persons harassment (O.M.), N.J.S.A. 2C:33-4(b); two counts of fourth-degree criminal sexual contact (I.N. and S.M.), N.J.S.A. 2C:14-3(b); and third-degree child endangering (S.M.), N.J.S.A. 2C:24-4(a). After merging counts three and four, on July 21, 2017, the judge sentenced defendant to three years probation, conditioned upon 364 days county jail time. The judgment of conviction states "probation may terminate upon release" from jail. The judge also imposed the reporting and registration requirements of Megan's Law and parole supervision for life. N.J.S.A. 2C:7-1; N.J.S.A. 2C:43-6.4. Defendant appeals and we affirm.

Pretrial, defendant sought unsuccessfully to sever the counts of the indictment for trial purposes as they relate to the three victims. The judge denied the application based on his analysis of N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328 (1992).

The judge granted the State's motion in limine to exclude certain evidence, including that the victims, S.M. and O.M., who had previously been friends with defendant's daughter A.W., allegedly sent unsavory text messages, and engaged in a verbal altercation with her. At the State's request, the judge also barred testimony regarding specific instances of the victims' conduct, and the content

of an audio recording from an August 4, 2012 meeting between defendant, his wife, and O.M. and S.M.'s parents. The pretrial January 11, 2017 order, also refers to "defendant's statement" being inadmissible. The matter initially resulted in a mistrial.

During the jury selection in the trial that resulted in the conviction now on appeal, the judge and a potential juror engaged in an on-the-record exchange regarding that juror's belief that if criminal charges were brought against a person, there must be strong evidence. The juror, when asked, said the belief was not strongly held. We include the dialogue in the relevant section of this opinion.

After the jury was sworn, the prosecutor was advised by I.N. that the date in the indictment—mid-August—was not correct, based on August 1 and 2, 2012 messages she had just discovered on her Facebook page. The judge granted defendant a thirteen-day continuance in which to investigate the change in dates, but denied his motion for another mistrial. After the continuance, when the trial resumed, the judge granted the State's motion amending the indictment counts regarding S.M. to reflect the new date—on or about July 31, 2012—from mid-August.

3

The trial testimony established that defendant was the founder and pastor of a small church that included as members the victims and their families and conducted services in a hotel conference room. Defendant and his family resided in a one-bedroom apartment, and the bedroom doubled as his pastoral office.

O.M. testified that during a Sunday service on or about June 29, 2011, while a slideshow of a congregant's birthday party was being shown, defendant groped her buttocks and said "[y]ou shouldn't wear stuff like that. . . . [o]nly your husband is supposed to see your butt." O.M., who was then sixteen, understood defendant's reference to be to the outfit she wore at the party, depicted on the slides. Afterwards, defendant proceeded to the front of the room and finished the service. As everyone was leaving, defendant approached O.M. again, while she was still seated, and grabbed her buttocks a second time through the opening of the back of the chair. O.M. stood up and yelled "stop effing touching me[,]" and defendant's wife told her she was being disrespectful. In response O.M. said that maybe defendant's wife should tell defendant to stop touching her, and she left the room.

Later on, O.M. told her then-boyfriend, defendant's nephew, about the incident but asked him not to disclose the information to anyone else. He

A-0269-17T4

nonetheless called defendant and said he had heard some stuff and that "[i]f you don't change your way, you're going to be . . . that sinner[,]" referring to a particular passage in the Bible about an adulterer. Defendant responded by saying "[o]kay, my brother, my son[,]" and the men then prayed together. By the time of trial, defendant's nephew had married O.M. We more fully detail the testimony in the relevant sections.

Fifteen-year-old I.N. was friendly with O.M., S.M., and defendant's daughter. Like the others, she spent time "almost every other day" with defendant and his family. In November 2011, she visited defendant's daughter, while defendant, the daughter's younger sister and brother, as well as defendant's parents, were present. When I.N. arrived, she went into defendant's bedroom/office to say hello, gave him a hug, and left the room. Defendant called her back, directing her to close the door. She gave him another hug, and as she did so, he touched her belly button over her clothes, which she thought was "weird." She left the apartment briefly, and when she returned later, defendant called her back into the bedroom. He again told her to close the door, and she gave him a hug, except this time he converted it to a "hug that you would give your spouse[.]" Defendant held onto her arm and began to rub her back. He again touched her belly button, this time going underneath her shirt. Defendant

A-0269-17T4

unbuttoned I.N.'s jeans and inserted his hand. I.N. was wearing tights beneath her jeans because it was winter, and defendant rubbed her vagina over her tights, asking her if she shaved. She did not respond, and defendant stopped when his youngest daughter entered the room. I.N. ran out of the house.

About a month after this incident, O.M. and I.N., who had a shared study hall in school, talked about defendant. I.N. told O.M. he had touched her on her vagina. I.N. told no one else.

Several months later, on or about July 31, 2012, thirteen-year-old S.M., O.M.'s younger sister, was invited by defendant's daughter to go to the park with her family. When S.M. arrived at the apartment, defendant's younger daughter and son were present. Defendant arrived not long thereafter.

Defendant walked into his bedroom and asked S.M. to close the door, which she did, but not completely. While seated in his computer chair, defendant asked S.M. to hug him, and as she did so, he placed his left hand on her buttocks and his head between her breasts. He moved his head up and down, making a humming noise. Defendant placed his right hand on her inner thigh, moved his hand towards the inside of her shorts, and asked her if she shaved. Over her underwear, he rubbed her vagina and asked her if she liked it. Defendant did this for quite some time, eventually putting his hand under her

6

underwear. He remained seated the entire time, with his left hand on S.M.'s buttocks. Defendant stopped when the phone rang and one of his younger children called out that "[m]om is on the phone." He asked S.M. to keep what had happened a secret. She did not answer and left the room when one of defendant's children entered with the phone.

After the incident, defendant and all the children, including S.M., went to the park. The following day, August 1, 2012, S.M. called and disclosed to defendant's daughter, crying as she spoke. Her older sister O.M. overheard the conversation, O.M. asked S.M. to tell her what had occurred, and they told their mother. O.M. then disclosed the church incident during which defendant had touched her buttocks. That same day, O.M. reached out to I.N., who was in Jamaica, on Facebook Messenger. O.M. told I.N. that if she remained silent regarding the incident with defendant, O.M. would tell I.N.'s mother about it herself. After the conversation, I.N. disclosed to her mother.

Defendant's daughter and wife testified on his behalf. They disputed the versions of events given by the girls, and attempted to cast doubt on their credibility. Defendant's daughter agreed that around July 31, 2012, S.M. called her and complained that defendant had "touched her on her private parts in his

7

bedroom the day before[,]" but said she never saw either S.M. or I.N. leave the family's apartment in tears.

Defendant's wife testified that in addition to defendant and their three children, her parents lived in the one-bedroom apartment. Defendant and she slept in the bedroom office, her children slept in the living room, and her parents slept in the dining room.

Defendant's wife said the victims had been close friends of her daughter, and would refer to defendant as "[u]ncle" or "[d]addy," and call her "[a]untie" or "[m]ommy." Defendant would often greet the girls with a hug and kiss them on the forehead. It was not uncommon for them to go into the bedroom to say hello to him. She did not recall either S.M. or I.N. leaving the apartment upset or in tears.

Defendant's wife was present at a meeting with defendant, O.M., and S.M.'s parents, during which they described instances of lying and disciplinary problems with their daughters. The meeting was recorded. The recording was poor in quality. In fact, according to the judge's description, the only clearly audible portion was the prayers at the end of the tape.

During closing argument, defense counsel told jurors:

> At the outset I asked you to think about three questions, to keep three questions in mind: First, does

A-0269-17T4

it make sense?  Second, is it consistent?  And the ultimate question, is it true?  Now having heard the testimony in this case I would submit that we have the answers to those questions.  No, it isn't consistent.  It doesn't make sense.  It's not true.

Additionally, defense counsel said:

The prosecutor may want you to ask yourselves why?  Why would these girls make this up?  Why would they go through this process, drag themselves to court, put themselves at the mercy of this process?  Why would they do this?  Why is not a question for the jury to consider in this case.  You are here to decide a much more important question, if.  If this happened.  If these things are true.  If it makes sense.  If the State has met its burden of proving this case beyond a reasonable doubt.

Don't ask yourselves why.  You won't find an answer to the question.  I know this because [defendant] has been looking for this answer for four years.

The prosecutor objected and as a result, when the judge gave the model jury charge explaining defendant's election not to testify, he added language instructing jurors not to consider the nature of defendant's feelings about the charges.

During his closing, the prosecutor told jurors they had:  "the unique ability to force upon the defendant a responsibility that he does not want to accept.  You have the power and opportunity through your verdict to say to him:  You are responsible for what you did to these three girls[.]"

A-0269-17T4

On appeal, defendant raises the following points of error:

POINT I
IT WAS ERROR FOR THE COURT TO AMEND THE INDICTMENT OVER DEFENDANT'S OBJECTION AFTER THE FIRST TRIAL ENDED IN A MISTRIAL.

POINT II
THE DEFENDANT'S MOTION FOR A MISTRIAL FOLLOWING LATE DISCLOSURE OF DISCOVERY AFTER COMMENCEMENT OF THE SECOND TRIAL SHOULD HAVE BEEN GRANTED.

POINT III
THE GRANTING OF THE STATE'S MOTION TO EXCLUDE CERTAIN EVIDENCE PROFFERED BY THE DEFENDANT IN THE DEFENSE OF THE CHARGES WAS ERROR.

POINT IV
THE PRESENTATION OF EVIDENCE BY THE STATE DISCLOSED TO DEFENDANT AFTER THE TRIAL HAD COMMENCED DENIED THE DEFENDANT A FAIR TRIAL.

POINT V
THE ADMISSION OF HEARSAY STATEMENTS PURPORTEDLY MADE BY THE DEFENDANT WAS AN ABUSE OF DISCRETION AND DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT VI
THE DENIAL OF THE DEFENSE MOTION TO EXCUSE A JUROR FOR CAUSE WHO VIEWED THE INDICTMENT AS EVIDENCE OF GUILT WAS ERROR.

A-0269-17T4

POINT VII
THE FAILURE TO GRANT THE DEFENDANT'S PRE-TRIAL MOTION TO SEVER THE COUNTS OF THE INDICTMENT WAS ERROR.

POINT VIII
GROSSLY PREJUDICIAL STATEMENTS MADE BY THE PROSECUTOR DURING HER SUMMATION DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT IX
THE JURY INSTRUCTION GIVEN BY THE COURT IN ITS FINAL CHARGE AT THE REQUEST OF THE STATE OVER DEFENDANT'S OBJECTION WAS ERROR.

POINT X
THE AGGREGATE OF ERRORS DENIED DEFENDANT A FAIR TRIAL.

I.

Defendant's points of error I, II, and IV are so lacking in merit as to not warrant much discussion in a written opinion. R. 2:11-3(e)(2). When S.M. belatedly discovered her Facebook messages, the only effect was to change the dates of the alleged assaults by approximately two weeks. To address this change, the judge granted defendant a lengthy continuance, and thereafter granted the State's motion to have counts three and four of the indictment amended to read that the crimes occurred on or about July 31, 2012.

Rule 3:7-4 authorizes the precise modification made in this case. It was merely a correction, moving the date of the offense approximately two weeks earlier than originally given. That the original indictment date was incorrect had to be known to defendant—the meeting with the victims' parents to discuss O.M. and S.M.'s disclosures took place before that date. Thus, defendant's motion for a mistrial was properly denied, as no injustice resulted in the modification.

Similarly, the judge did not err by allowing the Facebook messages into evidence because the State did not violate the discovery rules by producing them immediately once located by the victim. The judge appropriately continued the matter to allow defendant time in which to investigate. He granted the motion to amend the date in the indictment only after the postponement. The State could not be expected to produce discovery not in its possession, innocently discovered at the eleventh hour. See R. 3:13-3(b) and (f).

II.

A trial court's evidentiary rulings are entitled to substantial deference. State v. Kuropchak, 221 N.J. 368, 385 (2015). On appellate review, they are reversed only where they constitute an abuse of discretion. Ibid. When a trial court engages in a N.J.R.E. 403 weighing of the probative value of evidence

against its prejudicial effect, the ruling should be overturned only if it constitutes "a clear error of judgment," State v. Koedatich, 112 N.J. 225, 313 (1988), one "so wide of the mark that a manifest denial of justice resulted." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (2016)).

Defendant contends that the judge erred in excluding from evidence the following: defendant's daughter's testimony regarding letters and text messages she claims she received from the victims; the daughter's testimony regarding a confrontation with O.M. and S.M., during which they allegedly used foul language; defendant's wife's testimony regarding the meeting that took place on August 4, 2012, between defendant, O.M. and S.M.'s parents, and the audio recording of the meeting.

Defendant's daughter claimed that the victims yelled and screamed derogatory comments at her, that she received derogatory text messages regarding her father and mother, and derogatory messages about herself, she believed, from the victims. She could not recall any details regarding the confrontation with the victims. She did not recall the cell phone number at which she received these messages, however, since she no longer had the phone. The text messages could not be retrieved, and when interviewed by defendant's

investigator, defendant's daughter could not say with certainty when they were sent or even from whom.

The judge ruled that the communications and the verbal confrontation were inadmissible because they lacked any foundation, would invite speculation by the jury, and would confuse them. Additionally, the altercation between the girls was merely an individual instance of improper conduct, not admissible under the evidence rules.

Given defendant's daughter's inability to produce the texts and to identify the author, it would have been impossible to authenticate them as required by N.J.R.E. 901. Although authentication need not be complex, the proponent of the evidence must at least proffer either direct or circumstantial proof establishing the identity of the author. See State v. Tormasi, 443 N.J. Super. 146, 156 (App. Div. 2015). The judge's decision to exclude them was thus far from an abuse of discretion.

N.J.R.E. 405(a) states that a witness's character trait, including for truthfulness, cannot be proven by specific instances of conduct other than prior convictions. State v. Parker, 216 N.J. 408, 418 (2014) (citing State v. Spivey, 179 N.J. 229, 242-43 (2004)). In this case, the alleged verbal altercation fell

into the category of a specific instance of conduct. Its exclusion was a proper exercise of discretion.

The same rationale supports the exclusion of defendant's wife's testimony regarding the pastoral meeting and the recording. Defendant's wife wanted to testify that O.M. and S.M.'s parents during the meeting complained that O.M. was not attending school, was rebelling, and had a big problem with anger management for which she received instruction while at school. This evidence was excluded not only as impermissible hearsay, it was also properly excluded because it represented instances of specific conduct intended to cast doubt on O.M.'s credibility. O.M. and S.M.'s parents' alleged statement to defendant and his wife that their daughters were liars, because they had lied in the past, also violated the precept that single instances of prior conduct could not be used to attack credibility.

The judge found the recording of the meeting between defendant and the victims' parents to be impossible to understand except for the end, when the parties could be heard praying. The judge ruled the tape inadmissible based on the cleric-penitent privilege. See N.J.R.E. 511. Regardless, it should not have been admitted because it included hearsay statements involving single instances

15  A-0269-17T4

of conduct not admissible to attack credibility.  See N.J.R.E. 405(a).  Overall, defendant's third point lacks merit.

III.

Defendant in his fifth point of error challenges the admission of defendant's nephew's trial testimony describing the phone conversation he had with defendant.  The contention is reviewed employing the plain error standard as defendant did not object during trial.  The conviction will stand unless the error was "clearly capable of producing an unjust result," that is, if it was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  State v. Macon, 57 N.J. 325, 336-37 (1971); R. 2:10-2.

We quote the entirety of the objected-to testimony:

> [PROSECUTOR]:  Did you ever talk to the defendant about what had happened with [O.M.]?
>
> [NEPHEW]:  No.
>
> [PROSECUTOR]:  Okay.  Did you ever have a conversation with him about the circumstances of the information that you learned from [O.M.]?
>
> DEFENSE COUNSEL:  Objection; asked and answered.
>
> THE COURT:  I'm going to permit the question.  I'll note your objection for the record.

[NEPHEW]:  I'm sorry, one more time?

[PROSECUTOR]:  Sure.  Did you ever have a conversation with the defendant about the circumstances that you learned about from [O.M.]?

[NEPHEW]:  Yes.

[PROSECUTOR]:  Okay.  And how did that conversation come about?

[NEPHEW]:  I -- before I contact[ed] the defendant . . . I searched the scripture of the Bible about adultery and then I -- I called him over the phone and I was talking and I told him of what I've heard.  I didn't directly tell him who told me, but I've told him I heard some stuff.  And at the end of the conversation, we -- he -- I said "If you don't change your way, you're going to be . . . that sinner."  And he said "Okay, my brother, my son[]" and we prayed and hung up and that was it.

The testimony was admissible pursuant to N.J.R.E. 803(b), the doctrine of "adoptive admissions," statements by third parties that are adopted by the party to whom the admission will be attributed.  McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 529 (2003).  N.J.R.E. 803(b)(2) provides that statements "whose content the party has adopted by word or conduct or in whose truth the party has manifested belief" are admissible.  The rule is applied "with caution" to avoid "prejudice and injustice."  McDevitt, 175 N.J. at 529 (quoting Greenberg v. Stanley, 30 N.J. 485, 498 (1959)).

"A hearsay statement qualifies as an adoptive admission if two criteria are satisfied." Ibid. "First, the party to be charged must be aware of and understand the content of the statement allegedly adopted." Ibid. (citing State v. Briggs, 279 N.J. Super. 555, 562 (App. Div. 1995)). In other words, the proponent of the evidence must show that the party actually heard and understood what was said. Id. at 529-30. "Second, it must be clear that the party to be charged with the adoptive admission 'unambiguously assented' to the statement." Id. at 530 (quoting Briggs, 279 N.J. Super. at 563).

The nephew's brief description of his conversation with defendant established that defendant understood and unambiguously assented to his nephew's words—that he was becoming "that sinner," an adulterer in a Bible verse, by virtue of his "[o]kay" and their mutual prayer. Defendant now asserts his response was ambiguous and therefore did not meet the second prong of the test for admission. Even if that were the case, the testimony did not have the capacity to lead the jury to a result they would not have otherwise reached.

The nephew's testimony was presented to the jury as fresh complaint evidence, not substantive evidence of guilt. And the judge instructed the jury it was being proffered "to negate any inference that the victims failed to tell

A-0269-17T4

anyone about the sexual offense, and that, therefore, any assertion could not be believed."  Admission of the testimony was thus not error.

IV.

During jury selection, a potential juror said that the fact a person is "arrested, indicted[,] to me means there must be some kind of substantial evidence, otherwise we wouldn't be here today."  When the judge asked if he could set that notion aside, the juror said it would not be difficult to do so.  He added that he would be able to follow jury instructions and listen to the case with an open mind.  The juror repeated, when asked, that his opinion regarding the nature of the evidence was not strongly held.  Defense counsel requested that the juror be removed for cause, and the application was denied.  Counsel later used a peremptory challenge in order to excuse the juror.

"Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'"  State v. Papasavvas, 163 N.J. 565, 595 (2000) (quoting State v. Jackson, 43 N.J. 148, 160 (1964)).  In order for a forced expenditure of a peremptory challenge to constitute reversible error, a defendant must demonstrate that a partial juror participated in deliberations as a result of

defendant's exhaustion of peremptories. State v. DiFrisco, 137 N.J. 434, 470 (1994).

We do not agree with the contention that the judge's refusal to excuse the juror for cause was an abuse of discretion. Furthermore, defendant does not even contend that one of the remaining jurors who deliberated was in fact a partial juror. See DiFrisco, 137 N.J. at 471. This point is not a basis for reversal.

V.

Defendant contends that the judge's decision to deny severance of the first and second counts regarding O.M. and I.N., which allegedly took place almost a year earlier than the offenses relating to S.M., unfairly prejudiced the outcome. Defendant argues that N.J.R.E. 404(b) would not have permitted introduction of the evidence related to the first crimes as proof of the second or vice versa.

In denying defendant's motion for severance, the judge found, citing State v. Cusick, 219 N.J. Super. 452 (App. Div. 1987), and State v. Stevens, 115 N.J. 289 (1989), that the evidence of each incident would be admissible to prove that defendant's purpose in touching his victims was sexual gratification. The judge further found that any apparent prejudice was outweighed by the probative value of the evidence.

Rule 3:7-6 provides that:

Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan.

"Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72-73 (2013) (citing State v. Chenique-Puey, 145 N.J. 334, 341 (1996); State v. Coruzzi, 189 N.J. Super. 273, 298 (App. Div. 1983)). Rule 3:15-2(b) provides that a trial judge has the discretion to "order separate trials on counts of an indictment if a party is prejudiced by their joinder." State v. Oliver, 133 N.J. 141, 150 (1993).

"The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" Sterling, 215 N.J. at 73 (alteration in original) (quoting Chenique-Puey, 145 N.J. at 341). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Chenique-Puey, 145 N.J. at 341 (quoting Coruzzi, 189 N.J. Super. at 299).

21

N.J.R.E. 404(b) states:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

To determine the admissibility of other-crimes evidence under N.J.R.E. 404(b), our Supreme Court, in State v. Cofield, 127 N.J. 328, 338 (1992), created a four-prong test:

> (1) [t]he evidence of the other crime must be admissible as relevant to a material issue;
>
> (2) [i]t must be similar in kind and reasonably close in time to the offense charged;
>
> (3) [t]he evidence of the other crime must be clear and convincing; and
>
> (4) [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid. (citation omitted).]

"The decision whether to grant severance rests within the trial court's sound discretion and is entitled to great deference on appeal." State v. Brown, 118 N.J. 595, 603 (1990). See also Sterling, 215 N.J. at 73 ("A court must

assess whether prejudice is present, and its judgment is reviewed for an abuse of discretion.").

Evidence of all the contacts were admissible at a single trial to prove defendant's motive and opportunity. Defendant engaged in these acts for sexual arousement or gratification. See Cusick, 219 N.J. Super. at 464-66. The other crimes evidence was also important here because it was relevant to defendant's argument that the size of his apartment, and the location of the bedroom, made it impossible for him to have been able to commit the crimes charged. See Oliver, 133 N.J. at 153. This is an independent basis for admission, in addition to the judge's belief they established defendant's motive as sexual gratification. Oliver remains the leading case of the admissibility after relevant N.J.R.E. 404(b) analysis of other-crimes evidence to establish opportunity. Ibid.

In Oliver, the defendant moved to sever the counts of an indictment related to the sexual assaults of different women. Id. at 145. The Supreme Court held that the "defendant would not be prejudiced by joinder because . . . evidence of the severed offenses would be admissible under [N.J.R.E. 404(b)] on the questions of the feasibility of committing the assaults, defendant's use of pretext, and defendant's intent[.]" Id. at 151. The same holds true here.

23

The distance in time was not so great between incidents as to preclude their admission in a single trial. In <u>State v. Krivacska</u>, 341 N.J. Super. 1, 41 (App. Div. 2001), we found that similar sexual assaults some two years apart, approximately twice the time in this case, were nonetheless admissible.

The probative value of the evidence outweighed any undue prejudice. Joining the charges in one indictment and one trial would not have "divert[ed] the minds of the jurors from a reasonable and fair evaluation of the issues in the case." <u>State v. Long</u>, 173 N.J. 138, 163-64 (2002) (quoting <u>State v. Koskovich</u>, 168 N.J. 448, 486 (2001)).

## VI.

The objected-to language during the prosecutor's summation is as follows:

> Now, you have the unique ability to force upon the defendant a responsibility that he does not want to accept. You have the power and opportunity through your verdict to say to him: You are responsible for what you did to these three girls, these three girls who came to you for advice, these three girls who looked up to you, trusted you, respected you. You alone are responsible for your actions. I am going to ask that you go in to that jury room and bring back a verdict that the facts dictate and justice demands, a verdict of guilty.

Defendant did not object. The issue is thus subject to review under the plain error standard. <u>See</u> <u>State v. Pressley</u>, 232 N.J. 587, 593 (2018). Defendant simply has not demonstrated that the comments substantially affected his rights.

24

The prosecutor exhorted the jury to return a verdict ultimately based on the evidence. It did not deprive defendant of a jury that could fairly evaluate the merits of his defense. See id. at 593-94.

Defense counsel had argued in summation: "Don't ask yourselves why. You won't find an answer to the question. I know this because [defendant] has been looking for this answer for four years." As a result, the judge, who had sustained the objection read to the jury a curative instruction. It incorporated the model jury charge on defendant's election not to testify as well as the additional language related to defense counsel's comments:

> As you know, the defendant in this case has elected not to testify. It is his constitutional right to remain silent. You may not consider for any purpose or in any manner in arriving at your verdict the fact that the defendant did not testify. That fact should not enter into your deliberations or discussions in any manner or at any time. The defendant is entitled to have the jury consider all the evidence presented at trial. He is presumed innocent whether or not he chooses to testify.[1]
>
> Any reference as to what the defendant is thinking, any reference as to his feelings regarding this case and the charges against him, any suggestion as to what the defendant would have said had he testified, or what would happen after your verdict is returned shall not be considered by you during your deliberations.

---

[1] Model Jury Charges (Criminal), "Defendant's Election Not to Testify" (rev. May 4, 2009).

> Those comments are beyond the scope of the evidence, and none of the information has been presented to you by way of testimony or other evidence. Any suggestion by either party as to the information that has not been presented and testified to or about the consequences of this trial are to be disregarded and not -- by you and not be a part of your deliberations.

When a defendant "attempts to inject his unsworn comments into a trial by word, gesture, display of emotion, or other demeanor," it may justify an instruction from the judge for the jury to ignore it. State v. Rivera, 253 N.J. Super. 598, 604 (App. Div. 1992). Curative instructions are left to the discretion of the trial judge "who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Loftin, 146 N.J. 295, 365-66 (1996) (quoting State v. Winter, 96 N.J. 640, 647 (1984)).

Although a quick instruction to the jury after the comment may have sufficed, that the judge elected to give a longer curative instruction, following the election not to testify charge was not an abuse of discretion that prejudiced the outcome. The jurors, ultimately, were told that they had to consider only the evidence presented in the case.

A-0269-17T4

VII.

Finally, defendant argues that the errors in combination deprived him of a fair trial. Since no errors occurred, defendant was not deprived of his right to a fair trial.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0269-17T4